**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**In re Proposed agreements with TRUMP ENTERPRISES, INC.**
**No. 70–347.**

United States District Court,
E. D. Pennsylvania.
March 7, 1975.

Ivan Shomer, Philadelphia, Pa., and Robert D. Brooks, New York City, for trustees, PCTC.

Sullivan & Worcester by Morris Raker, and Edward Woll, Jr., Boston, Mass., and Gratz, Tate, Spiegel, Ervin & Ruthrauff by Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, trustee, New York, New Haven & Hartford RR Co.

David Berger, Philadelphia, Pa., for Penn Central Co.

Arsham & Keenan by Arthur A. Arsham, New York City, for the New York Times Co.

James F. Dausch, Dept. of Justice, Washington, D. C., for the U. S. A.

Herman J. Getzoff, pro se.

Herbert S. Chason, pro se.

## MEMORANDUM AND ORDER NO. 1807

FULLAM, District Judge.

The Trustees have filed a petition (Document No. 8001) seeking authority to enter into an agreement with Trump Enterprises, Inc. ("Trump"), a major New York residential developer, for the development and construction of high-rise housing projects on Penn Central's 30th and 60th Street yards, located in the West Side area of Manhattan. The agreement, as amended, contemplates a multiphase development effort, over a period of ten years or more. The Debtor's estate would receive at least $62 million, plus an option to acquire a 25% equity interest in the projects. The Trustees estimate that the total value which would be realized by the Debtor's estate would be in excess of $120 million.

The proposal now before the Court represents an improvement over the original agreement, which had been objected to in varying degrees by certain parties to these proceedings. No party to the reorganization proceeding has expressed objections to the present proposal.

However, another major New York developer, HRH Construction ("HRH"), and its broker, Herman Getzoff, have advanced a counter-proposal for the development of the same properties, asserting that their proposal would yield a greater return to the Debtor's estate. The Trustees contend that HRH does not have standing in this matter, since its only interest is based upon its expectation of profit from dealings with the Debtor, rather than on considerations of benefit to the Debtor's estate. While I am inclined to agree that the Trustees' position is technically correct, I believe the Court has a general duty to insure that the interests of the estate are protected; and it would seem unwise to dismiss out of hand a claim that the Trustees' proposal is not in the best interests of the Debtor's estate, merely because that claim is not made by a party with recognized standing.

On the entire record, however, I have concluded that the Trump proposal is at least as advantageous to the Debtor's estate as the HRH proposal would be, and that there is therefore no reason to interfere with the Trustees' exercise of their business judgment. In the first place, it is significant that no creditor group or other party to the reorganization has expressed a preference for the HRH proposal. This factor is

particularly important where, as here, creditors have undertaken discovery and have retained experts to scrutinize the merits of the Trustees' proposal and its alternative. Creditor interests in these proceedings have not heretofore hesitated in challenging proposals advanced by the Trustees whenever there was a genuine question as to where the best interests of the estate lay.

Secondly, the manner in which HRH has contested the Trustees' proposal occasions some doubt that its counter-proposal has been thoughtfully prepared or is being seriously advanced. The Trustees' intention to enter into an agreement with Trump was made public in early August 1974, with the filing of the Trustees' petition. The first indication that outside interests would challenge the Trustees' petition came in the form of an affidavit of Mr. Getzoff, dated October 31, 1974, averring that the terms of the Trump agreement were not the best that could be negotiated for the estate, and that Mr. Getzoff knew this to be true because he had found a builder, Starrett Brothers, which had offered better terms (but which subsequently withdrew its offer). Within a week, Mr. Getzoff had located another developer, HRH, interested in the West Side Yard properties; and by letter of November 7, 1974, HRH made its offer to the Trustees. At the hearing on November 11, 1974, only Mr. Getzoff and a co-broker appeared to oppose the Trustees' petition and to support the HRH proposal. HRH itself was not in attendance. Finally, despite my suggestion at the hearing that anyone seriously contesting the Trustees' petition should "get in the posture of litigating," neither HRH nor its brokers have seen fit to retain counsel, but have persisted in pursuing their interests by merely sending copies of their correspondence with the Trustees to the Court.

██ Finally, it bears emphasis that it is primarily the function of the Trustees, and not of this Court, to make the kinds of business judgments involved in choosing among potential purchasers or co-venturers. This Court should interfere with the Trustees' proposed transactions only if they are legally impermissible or not in the best interests of the Debtor's estate or its reorganization. After comparing the terms of the Trump and HRH proposals, and recognizing the many contingencies inherent in each, I have concluded that there is no basis for interfering with the Trustees' choice between them.

Having concluded that the proposal warrants approval, I turn now to a consideration of whether there are legal obstacles precluding such approval. One such potential obstacle may be derived from the principles set forth by the Third Circuit Court of Appeals in In re Penn Central Transportation Co., 484 F. 2d 323 (3d Cir. 1973) (Sale of Park Avenue Properties), namely, that major dispositions of a debtor's property may not be authorized under § 77(o) of the Bankruptcy Act, but must await the formulation of the reorganization plan. The court held, further, that the size of the transaction proposed, rather than as actually authorized, is the relevant consideration in determining whether the transaction is of sufficient magnitude to be regarded as beyond the limits of § 77(o) approval. Although the opinion contains no precise guidelines for the ad hoc determinations presumably required by its rationale, it seems reasonably clear that the present transaction, considerably larger that what was actually authorized by this Court in the Park Avenue case, and roughly comparable in size to the transactions originally contemplated by the Trustees in that case, is of sufficient magnitude to trigger application of the Park Avenue doctrine.

The parties have attempted to distinguish the present transaction as equivalent to a "wasting asset" situation, pointing out that the values of the West Side properties as railroad yards are declining, that their continued maintenance would require vast outlays by the Debtor's estate, and that the Trustees have an obligation to preserve and

enhance the values attributable to the Debtor's estate, for the protection of creditors and other parties in interest. They point out that the Park Avenue properties were income-producing, whereas the present properties contribute to operating losses; and that consummation of the transactions here proposed would obviously benefit the Debtor's estate. The argument is made that the *Park Avenue* case, properly interpreted, does not apply to the present situation. While these arguments have undeniable appeal, the fact remains that the only transactions which were actually approved by this Court in the *Park Avenue* matter involved properties with many of the attributes of "wasting assets." While failure to approve the present transaction would undoubtedly result in very substantial reduction of the amount ultimately available for distribution to creditors in connection with a reorganization plan, I believe most persons would agree, at least with the benefit of hindsight, that similar unfortunate consequences flow from the non-consummation of the Park Avenue transaction.

 I have concluded, however, that it is unnecessary to reach a firm decision as to whether the *Park Avenue* decision could successfully be urged to bar the present proposal, for two reasons. In the first place, I believe the Court of Appeals decision in the *Park Avenue* case can properly be read as limiting only what a reorganization court may do over objection of lienholders. I do not believe the Court of Appeals intended to preclude approval of property dispositions by the Trustees with the consent or acquiescence of secured creditors. Since the present transaction has the express or tacit approval of the secured creditors affected,[1] I conclude that this Court may lawfully approve the transaction.

 In the second place, and perhaps more importantly, the *Park Avenue* case was decided in the context of what was assumed to be a standard § 77 railroad reorganization. The interposition of the Regional Rail Reorganization Act of 1973 has substantially altered an essential premise of the Park Avenue Opinion. While I am inclined to believe that, at least until the adoption of a Final System Plan pursuant to the RRRA (and thereafter, at least with respect to properties not included in such plan, and until the appropriate court orders otherwise), the Penn Central reorganization proceeding is still being conducted under § 77 of the Bankruptcy Act (or, to put it another way, that this is still a § 77 reorganization proceeding, except as modified by the RRRA), it seems reasonable to suppose that the reorganization-planning role of the Interstate Commerce Commission, which loomed large in the *Park Avenue* decision, has now greatly diminished in significance. The corresponding function, in the present context, would seem to be the submission of the proposal to United States Railway Association, a step which is contemplated by the agreement.

I recognize that some of the implications of the precise relationship between the RRRA and § 77 are now pending before the Court of Appeals, and I therefore deem it inappropriate to express any final view on these subjects. It suffices to state that the entire situation has changed to such an extent that it would be improper to assume that the *Park Avenue* decision stands as a bar to approval of the present transaction.

For all of the foregoing reasons, the Trustees' petition will be approved.

AUTHORIZING THE TRUSTEES TO ENTER INTO AND CARRY OUT AGREEMENTS WITH TRUMP ENTERPRISES, INC., RELATING TO 60th STREET and 30th STREET YARDS IN NEW YORK.

And now, this 7th day of March 1975, upon consideration of the "Petition of the Trustees for Authority to enter into and carry out agreement with Trump Enterprises, Inc., relating to 60th Street Yard and 30th Street Yard in New York,

---

1. It is clear, of course, that competing bidders lack standing to raise this issue.

New York" (Petition) and upon hearing duly noticed, it is ordered:

1. The Trustees are hereby authorized to enter into and carry out the terms of the 60th Street Yard and 30th Street Yard Agreements, as amended, in the form exhibited to the Court at the hearing on the Petition and to cause Despatch Shops, Inc. to become a party to the 30th Street Yard Agreement and to carry out its portion thereof and to take any and all action necessary and appropriate for this purpose.

2. The Trustees or their duly authorized designees are hereby authorized to sell and convey free and clear from all liens to the extent stated in the Agreements, as amended, to the party or parties and at the times and terms set forth in the Petition, and to execute and deliver any and all documents necessary to effectuate such transactions; provided however, that all liens on the 30th and 60th Street Yards at the time of sale, including liens authorized by the Court, shall attach to the proceeds from the sale, and to any interest or income earned thereon, in the respective order of priorities thereof.

3. The net proceeds of sale, after deduction of the expenses of sale, shall, subject to any liens thereon, be deposited with Girard Trust Bank in accordance with the provisions of Order No. 619 herein.

4. Before making any election to enter into one or more limited partnership agreements as specified in the 60th Street Yard Agreement and 30th Street Yard Agreement and any contributions to such limited partnerships required under each agreement the Trustees shall petition this Court on at least five (5) days' notice to all parties customarily notified seeking approval of any such election or contribution and no such election or contribution shall be made except upon further Order of this Court.

5. The Trustees are authorized to pay the incentive fee as set forth in the Petition.

